**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 21 2014, 9:14 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARK LEEMAN**
Logansport, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**CHRISTINE REDELMAN**
Office of Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: Z.S. (MINOR CHILD), | ) ) ) ) | |
| and | ) ) | |
| R.S. (FATHER), | ) ) | No. 09A04-1309-JT-473 |
| Appellant-Respondents, | ) ) | |
| vs. | ) ) | |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE CASS SUPERIOR COURT
The Honorable Richard A. Maughmer, Judge
Cause No. 09D02-1207-JT-34

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**PYLE, Judge**

STATEMENT OF THE CASE

R.S. ("Father") appeals the involuntary termination of his parental rights to his daughter, Z.S.

We affirm.

ISSUE

Whether the Department of Child Services ("DCS") presented clear and convincing evidence to support the termination of Father's parental rights.

FACTS

Z.S. was born on September 21, 2009. On June 20, 2011, DCS received a report alleging that Father and Z.S.'s mother, J.S. ("Mother"), were using methamphetamine, that they were abusing Z.S., that their home was in poor condition, and that they were not meeting the child's needs. A DCS worker conducted a home assessment the next day. The worker "found no concerns at the house during the home assessment." (Ex. Vol. II 361). Mother passed a drug screen, but Father was not available to take one at that time.

On August 8, 2011, Father submitted a drug screen at DCS's request and tested positive for methamphetamine. DCS opened an In-Home Child in Need of Services ("CHINS") case that required Father to move out of the house. DCS investigated another report of drug use by Mother. Mother tested positive for methamphetamine on August

25, 2011, and DCS took Z.S. into its custody. The following day, DCS filed a petition alleging that Z.S. was a CHINS.

The juvenile court held an initial detention hearing on September 2, 2011. There, Father and Mother initially denied that Z.S. was a CHINS. Eventually, they both admitted that Z.S. was a CHINS on October 11, 2011, and the juvenile court set the case for a dispositional hearing. At the dispositional hearing on December 7, 2011, the juvenile court entered its order, continuing Z.S.'s removal from her parents and ordering them to participate in services aimed at reunification. The juvenile court ordered, in relevant part, that Father maintain suitable employment and housing, that he refrain from using and selling any controlled substances, that he complete a substance abuse evaluation and participate in treatment, and that he submit to random drug screens.[1]

During the CHINS proceeding, Father had attended every scheduled visit with Z.S. However, his progress in addressing his substance abuse problem was inconsistent. Father completed an initial substance abuse evaluation. Yet, between August 2011 and November 2011, Father failed on two occasions to complete intensive outpatient treatment and failed two drug screens. On November 22, 2011, Father was arrested and charged with Class C felony possession of methamphetamine. Father posted bail and continued with services.

Father failed a third attempt at intensive outpatient treatment. Father was admitted into inpatient treatment at the TARA Treatment Center ("TARA"), a drug and alcohol treatment facility. His therapist at TARA, Antoinette Novotny ("Novotny"), stated that

---

[1] Mother eventually terminated her parental rights voluntarily.

Father completed inpatient treatment and did very well while under her care. Father did not have any positive drug screens while at the TARA facility. Novotny did express concerns about Father's aftercare because he planned on "returning [to] . . . the same triggers and same, basically, atmosphere, [and] barriers." (Tr. 178). She also expressed concern about Father's views on his addiction and marijuana use. Apparently, Father did not fully accept the possibility that continued use of marijuana was a risk for methamphetamine relapse. TARA discharged Father successfully from their program on March 11, 2012.

Father tested positive for amphetamine, methamphetamine, and THC on April 16, 2012. The trial court in Father's criminal case revoked his bond and remanded him to the county jail on May 9, 2012. Father eventually pled guilty to Class C felony possession of methamphetamine and was sentenced to an aggregate sentence of eight years, with six years executed in community corrections and two years suspended to probation. On July 18, 2012, the juvenile court held a permanency hearing and changed Z.S.'s permanency plan to adoption; DCS filed a petition to terminate Father's parental rights shortly thereafter. The court conducted the evidentiary hearing for DCS's petition on July 30, 2013 and August 30, 2013.

M.M. has been Z.S.'s foster mother for almost two years. M.M. testified that Z.S. is bonded to her and her husband and refers to them as mom and dad. M.M. mentioned that when Z.S. first came to her home, Z.S. had dental issues that needed to be addressed. Z.S. had to have her four front teeth pulled because of severe bottle rot. According to M.M., the dentist stated the bottle rot was due in part to what was in Z.S.'s bottles or

4

"what might have been in the atmosphere [of her previous home]." (Tr. 210). M.M. also expressed concerns about disciplining Z.S. and believed that once Z.S.'s placement was finally determined, those problems could subside. Specifically, M.M. testified that Z.S. "thinks, she thinks [sic] she gets to go and have fun every day. She thinks that she gets to go from parent to parent to parent and get whatever she wants out of us and so she's just going to keep thinking that." (Tr. 214). M.M. stated that she and her husband would adopt Z.S. if Father's parental rights were terminated.

Stacy Hawkins ("Hawkins"), a therapist with Lifeline Youth and Family Services, worked with Father and Z.S. Hawkins testified that while she observed good parenting skills from Father, she had continued concerns about his ability to remain sober. Specifically, she noted that because Father has a lengthy substance abuse history and that "Work Release" was "forced sobriety," there was a concern that he could relapse. (Tr. 49). Hawkins worked with Z.S. because she displayed confusion "with having two Mommies and two Daddies." (Ex. Vol. II 454). According to Hawkins, Z.S. was having tantrums with her foster parents and would sleep in their bed because of her having nightmares. Z.S. also would cry and beg not to go to visits with Mother and Father. After working with Hawkins, Z.S. would voluntarily go to visits, but she always "ensure[d] that she [would] be picked up by the foster parent or [be] returned by the visit staff." *Id*. at 455. M.M. had some success with redirecting some of Z.S.'s behavior, but some of the techniques she learned were no longer working. Hawkins testified that termination of Father's parental rights would be in Z.S.'s best interests because she is bonded to the foster parents, identifying them as "mommy and daddy." (Tr. 35).

5

Stephanie Neher ("OCM Neher"), the ongoing case manager for DCS testified that termination of Father's parental rights was in Z.S.'s best interests because she has concerns about Father's ability to stay sober absent incarceration. In addition, OCM Neher stated that Z.S. had been out of Father's care for almost two years and "taking her out of a home that she's been in longer than she ever was with her parent[s] is not in her best interest." (Tr. 259).

Dave Wegner ("Wegner"), the director of the Cass/Pulaski County Community Corrections department, supervised Father in the work release component. Wegner mentioned that he had discovered incidents where Father was at unauthorized locations. Father also violated the facility's cell phone usage policy by altering the contents of phone and text messages he received. Father faced an administrative hearing because of these violations and received a written reprimand. Wegner further stated that because of Father's behavior in the facility at that point, they were not willing to modify him to home detention at that time.

Jeffery Stanton ("GAL Stanton"), the guardian ad litem, filed a report July 23, 2013 stating the following:

> On one (1) hand[,] [Father] has been reporting to DCS and has taken advantage of all services provided to him. He has taken steps to have [Z.S.] returned to him. However, all of his "steps" have been taken with [the] hammer of incarceration hanging over his head. Prior to his sentencing, he had failed to take advantage of services and continued to use [controlled substances]. [Z.S.] seems to have a bond with her father. On a very close call, I recommend against the termination of [Father's] parental rights.

(App. 23). However, as GAL Stanton participated in the evidentiary hearing, he stated that he was not as comfortable with the recommendation he made in his report. On one

6

hand, GAL Stanton stated that he was impressed with the effort Father put forth after he was incarcerated. On the other hand, he was not comfortable with the fact that community corrections was not committed to transitioning Father to home detention at the time of the hearing. At the end of his testimony, GAL Stanton did not offer a new recommendation.

On September 10, 2013, the trial court entered an order terminating Father's parental rights. Essentially, the trial court concluded that there was a reasonable probability that the reasons for Z.S.'s continued placement out of Father's care would not be remedied and that termination of parental rights was in Z.S.'s best interests. Specifically, the trial court found that Father did not demonstrate that he could stay sober absent incarceration and that separating Z.S. from her foster parents after two years of being in their care would have a negative effect on her. Father now appeals. We will provide additional facts as necessary.

DECISION

Although parental rights are of a constitutional dimension, the law allows for termination of these rights when parties are unable or unwilling to meet their responsibilities. *In re A.N.J.*, 690 N.E.2d 716, 720 (Ind. Ct. App. 1997). The purpose of termination of parental rights is not to punish parents but to protect children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied*.

In reviewing the termination of parental rights, we will neither reweigh the evidence nor judge the credibility of witnesses. *In re I.A.,* 934 N.E.2d 1127, 1132 (Ind. 2010). We consider only the evidence most favorable to the judgment. *Id*. Where the

7

trial court has entered findings of fact and conclusions of thereon, we apply a two-tiered standard of review. *Id.* We must determine whether the evidence supports the findings and then whether the findings support the judgment. *Id.* We will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the conclusions or the conclusions do not support the judgment. *Id.*

When DCS seeks to terminate parental rights pursuant to INDIANA CODE § 31-35-2-4(b)(2), it must plead and prove, in relevant part:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> * * * *
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside of the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has on two (2) separate occasions, been adjudicated a child in need of services.
>
> (C) that termination is in the best interests of the child . . . .

Because subsection (b)(2)(B) is written in the disjunctive, DCS need prove only one of the three elements by clear and convincing evidence. *See Bester v. Lake Cnty Office of Family and Children*, 839 N.E.2d 143, 153 n.5 (Ind. 2005). These allegations must be

8

established by clear and convincing evidence. *I.A.*, 934 N.E.2d at 1133. If the trial court finds the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. I.C. § 31-35-2-8(a).

1. Conditions Remedied

Father argues that DCS did not present clear and convincing evidence that he would relapse. We restate Father's claim as whether the trial court erred in concluding that there was a reasonable probability that the conditions which supported Z.S.'s removal or continued placement outside of his care would not be remedied.

Determining whether the conditions justifying Z.S.'s removal or continued placement outside of Father's home would not be remedied requires a two-step analysis. First, we must determine what conditions led to Z.S.'s removal. *In re K.T.K.*, 989 N.E.2d 1225, 1231 (Ind. 2013). Second, we "determine whether there is reasonable probability that those conditions will not be remedied." *I.A.*, 934 N.E.2d at 1134. The trial court must judge a parent's fitness to care for the child at the time of the termination hearing, taking into consideration any evidence of changed conditions. *A.N.J.*, 690 N.E.2d at 721. The trial court must also evaluate the parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* A trial court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty Office of Family and Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 1999). Additionally, the trial court can properly consider the services offered by DCS to the parent and the parent's response to those services as

9

evidence of whether conditions will be remedied. *Id.* "DCS need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Here, we find that the trial court did not err in concluding that the reasons for Z.S.'s continued placement outside of the home would not be remedied. We acknowledge that at the time of the termination hearing, Father had been sober for over a year. However, this was mainly because of Father's incarceration. During the CHINS proceeding, Father had five positive drug screens. Father failed outpatient substance abuse treatment three times. Father did complete a twenty-day intensive inpatient substance abuse program on March 11, 2012. Yet, Father tested positive for methamphetamine a month after being discharged and was arrested for possession of methamphetamine two months later. In addition, Father's inpatient treatment coordinator expressed concern about Father returning to the same people and places that served as triggers for his methamphetamine use. She also testified that Father did not appreciate the risk that marijuana usage can cause a methamphetamine relapse. This evidence supports the juvenile's court's conclusion that Father could not remain sober absent incarceration and is sufficient to determine that a reasonable probability that the conditions for Z.S.'s continued placement outside of the home would not be remedied.

2. Best Interests

For the "best interests of the child" statutory element, the trial court is required to consider the totality of the evidence and determine whether the custody by the parent is

wholly inadequate for the child's future physical, mental, and social growth. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed*. In making this determination, the trial court must subordinate the interest of the parent to that of the child involved. *Id.* The recommendations of the service providers that parental rights be terminated support a finding that termination is in the child's best interests. *See A.J. v. Marion Cnty. Office of Family and Children*, 881 N.E.2d 706, 718 (Ind. Ct. App. 2008), *trans. denied*.

Father argues that DCS did not present clear and convincing evidence that terminating his parental rights was in Z.S.'s best interests. Father compares his case to *In re G.Y.*, 904 N.E.2d 1257 (Ind. 2009), *In re J.M.*, 908 N.E.2d 191 (Ind. 2009), and *H.G. v. Indiana Dep't. of Child Services*, 959 N.E.2d 272 (Ind. Ct. App. 2011) wherein our Indiana Supreme Court and this Court held that termination of parental rights was not in the best interests of the children involved. We distinguish Father's case from these previous opinions.

The parents involved in the cases cited by Father made progress with their respective issues *during* the CHINS process. In addition, for the parents that were incarcerated, their release was imminent. Here, after the CHINS dispositional hearing, Father was ordered to, among other things, maintain suitable and stable housing, complete an intensive outpatient program, refrain from using illegal controlled substances and submit to random drug screens. As previously stated, Father failed intensive outpatient treatment and tested positive for controlled substances five times. Father did complete an inpatient treatment program but relapsed one month after being discharged

11

by testing positive for methamphetamine. Two months after his discharge from inpatient therapy, Father was arrested and convicted of possession of methamphetamine. In addition, at the time of the hearing, Father had received several warnings that his performance in regards to the rules and regulations on work release placed him in danger of being revoked. Community Corrections was unwilling to commit to a date for Father to transition to home detention. With these facts, Father's reliance on *G.Y.*, *J.M.*, and *H.G.* fails.

Turning to the evidence, OCM Neher testified that termination was in Z.S.'s best interest because Z.S. needed a stable home and permanency that Father could not provide. M.M. essentially testified that a sense of permanency for Z.S. would help in curbing discipline problems she and her husband were experiencing with Z.S. Four-year-old Z.S. has lived with her foster family for half of her young life. As our Indiana Supreme Court has stated, "children cannot wait indefinitely for their parents to work toward preservation or reunification—and courts 'need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship.'" *In re E.M.*, 4 N.E.3d. 636, 647 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1235). This is especially true for children as young as Z.S.

Most importantly, we note that GAL Stanton originally recommended against terminating Father's parental rights in his report. However, after participating in the termination hearing, he withdrew his initial recommendation and made no further recommendation. Given Father's demonstrated inability to maintain sobriety absent

incarceration and the testimony of the service providers, the juvenile court's decision was not clearly erroneous. *See e.g.*, *Prince v. Dep't of Child Services*, 861 N.E.2d 1223, 1231 (Ind. Ct. App. 2007) (termination of parental rights was in child's best interests where parent failed to demonstrate she could remain sober absent compulsion from court).

Affirmed.

FRIEDLANDER, J., and MATHIAS, J., concur.